IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| STEPHEN M. FENERJIAN, individually and on behalf of a class of those similarly situated, | ) ) ) ) | No. _____ |
| Plaintiff, | ) ) | COMPLAINT CLASS ACTION |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| THE HOME DEPOT, INC., | ) ) | |
| Defendant. | ) ) ) | |

Plaintiff Stephen M. Fenerjian on behalf of a class of similarly situated people (further defined below) alleges the following upon personal knowledge as to himself and his own acts and as to all other matters upon information and belief, based upon, among other things, his attorneys' investigation.[1]

## I. INTRODUCTION

1. A data breach is not an act of God. It is, almost always, the predictable and preventable result of one or more security failures. According to a 2014 report by the Online Trust Alliance—an industry group of leading cybersecurity experts—89% of data breaches in 2013 were preventable. Similarly,

---

[1] All emphasis, unless otherwise indicated, is added.

Verizon Enterprise Solution's 2014 Data Breach Investigations Report—which examined over 63,000 security incidents with the assistance of dozens of industry and government stakeholders—found that "nearly every incident involve[d] some element of human error."  The Verizon report found that 92% of all attacks fell into one of nine predictable (and, thus, preventable) patterns.

2.      Defendant The Home Depot, Inc. ("Home Depot" or the "Company") failed to prevent a significant data breach (the "Breach") that compromised customers' personal financial data.   According to Home Depot, the Breach compromised approximately 56 million payment cards over a period of approximately six months. The Breach is the largest retail data breach of all time and occurred over one of the longest periods.

3.      As a result of Home Depot's lapses, criminal hackers were able to obtain access to credit and debit card data from members of the "Class": persons in the United States who used a credit or debit card at one of Home Depot's self-checkout kiosks between April 1, 2014 and September 7, 2014 (the "Relevant Period").

4.      The Breach was avoidable. As the New York Times wrote in a September 19, 2014 story: "The risks were clear to computer experts inside Home Depot: The home improvement chain, they warned **for years**, might be easy prey

for hackers. But despite alarms as far back as 2008, Home Depot was slow to raise its defenses, according to former employees." According to a September 12, 2014 report in *Businessweek*, Home Depot's information security chief, Jeff Mitchell, expressly told information security employees to aim for "C-level security" (as opposed to A- or B-level) because "ambitious upgrades would be costly[.]" According to former employees interviewed by *Businessweek*, "Home Depot was using out-of-date antivirus software for its point-of-sales systems" despite "staffers' pleas to executives" to upgrade the software.

5.     During the Relevant Period, Home Depot failed to disclose that its subpar security systems placed Class members' financial data at risk.  Had Class members received full disclosure of the security risks to which they were exposed, they would have paid less for the products they purchased or not purchased those products at all.  Now that the Breach has occurred, Class members have been further damaged by the need to take affirmative measures to protect against fraudulent charges and other acts of identity theft.

## II.   PARTIES

6.     Plaintiff Stephen M. Fenerjian is, and at all relevant times was, a resident of Massachusetts. On multiple occasions during the Relevant Period, Mr. Fenerjian shopped at a Home Depot in Norwood, Massachusetts—including at the

self-checkout kiosks—and paid with a credit card. Mr. Fenerjian's dates of purchases at Home Depot during the Relevant Period, include April 11, April 15, April 20, May 8, May 13, May 14, May 15, May 16, May 19, May 23, May 24, May 29, May 30, June 1, and June 20 (all of 2014). Upon information and belief, Mr. Fenerjian's credit card data was stolen as part of the Breach. As a result of the Breach, Mr. Fenerjian is now forced to monitor his financial accounts for fraudulent charges and other indications of identity theft. Had Mr. Fenerjian known that Home Depot did not abide by industry-standard cybersecurity practices, he would have paid less or not shopped at Home Depot at all.

7.    Defendant The Home Depot, Inc. (Home Depot) is a Delaware corporation with a corporate headquarters in Atlanta, Georgia.

## III.   JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Class are citizens of states different from Defendant's home states, and the aggregate amount in controversy exceeds $5,000,000, insofar as approximately 56 million cards were affected by the Breach.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because the Defendant maintains its principal place of business in this District.

## IV.   SUBSTANTIVE ALLEGATIONS

### A. Home Depot Customers' Data Was Compromised

10.   On September 2, 2014, an investigative reporter named Brian Krebs reported on his website, KrebsOnSecurity, that "Home Depot stores may be the source of a massive new batch of stolen credit and debit cards that went on sale this morning in the cybercrime underground." According to Krebs' analysis, the stolen cards were listed for sale on the same underground store used by the hackers responsible for the data breaches at Target, Sally Beauty, and P.F. Chang's, among others.

11.   On September 14, 2014, Krebs reported on a conference call that Mastercard held with a number of financial institutions regarding the Breach. According to Krebs, Mastercard "told banks that at this time it is believed that only self-checkout terminals were impacted in the breach, but stressed that the investigation is far from complete." This report is consistent with the number of cards exposed. The Target breach lasted three weeks and exposed approximately 40 million payment cards. This breach lasted almost six months, yet exposed "only" 56 million.

12.    On September 18, 2014, Home Depot confirmed the breach and estimated that 56 million cards had been affected, issuing the following press release:

> **The Home Depot Completes Malware Elimination and Enhanced Encryption of Payment Data in All U.S. Stores**
> * * *
> **Provides Further Investigation Details, Updates Outlook**
>
> **ATLANTA, September 18, 2014** -- The Home Depot®, the world's largest home improvement retailer, today confirmed that the malware used in its recent breach has been eliminated from its U.S. and Canadian networks. The company also has completed a major payment security project that provides enhanced encryption of payment data at point of sale in the company's U.S. stores, offering significant new protection for customers. Roll-out of enhanced encryption to Canadian stores will be complete by early 2015. Canadian stores are already enabled with EMV "Chip and PIN" technology.
>
> The company said its fiscal third quarter sales, including sales in September, are on plan. Additional guidance is provided below.
>
> **Investigation Details**
> The investigation into a possible breach began on Tuesday morning, September 2, immediately after The Home Depot received reports from its banking partners and law enforcement that criminals may have breached its systems.
>
> Since then, the company's IT security team has been working around the clock with leading IT security firms, its banking partners and the Secret Service to rapidly gather facts, resolve the problem and provide information to customers.
>
> The company's ongoing investigation has determined the following:

- Criminals used unique, custom-built malware to evade detection. The malware had not been seen previously in other attacks, according to Home Depot's security partners.

- The cyber-attack is estimated to have put payment card information at risk for approximately 56 million unique payment cards.

- The malware is believed to have been present between April and September 2014.

To protect customer data until the malware was eliminated, any terminals identified with malware were taken out of service, and the company quickly put in place other security  enhancements. The hackers' method of entry has been closed off, the malware has been eliminated from the company's systems, and the company has rolled out enhanced encryption of payment data to all U.S. stores.

There is no evidence that debit PIN numbers were compromised or that the breach has impacted stores in Mexico or customers who shopped online at HomeDepot.com or HomeDepot.ca.

The Home Depot is offering free identity protection services, including credit monitoring, to any customer who used a payment card at a Home Depot store in 2014, from April on.  Customers who wish to take advantage of these services can learn more at www.homedepot.com or by calling 1-800-HOMEDEPOT (800-466-3337). Customers in Canada can call 800-668-2266.

"We apologize to our customers for the inconvenience and anxiety this has caused, and want to reassure them that they will not be liable for fraudulent charges," said Frank Blake, chairman and CEO. "From the time this investigation began, our guiding principle has been to put our customers first, and we will continue to do so."

**Payment Security Enhancements**

The company's new payment security protection locks down payment data through enhanced encryption, which takes raw payment card information and scrambles it to make it unreadable and virtually useless to hackers. Home Depot's new encryption technology, provided by Voltage Security, Inc., has been tested and validated by two independent IT security firms.

The encryption project was launched in January 2014. The rollout was completed in all U.S. stores on Saturday, September 13, 2014. The rollout to Canadian stores will be completed by early 2015.

EMV "Chip and PIN" technology, which began rolling out in early 2013 and already exists in Canadian stores, will be deployed to all U.S. stores by the end of the year, well ahead of a 2015 deadline established by the payments industry.

These projects required writing tens of thousands of lines of new software code and deploying nearly 85,000 new pin pads to stores.

13.     That same day, Krebs reported that "multiple financial institutions [were] report[ing] that the alerts they're receiving from Visa and MasterCard about specific credit and debit cards compromised in this breach suggest that the thieves were stealing card data from Home Depot's cash registers up until Sept. 7, 2014, *a full five days after news of the breach first broke.*"

### B. Home Depot Could Have Prevented the Breach

14.     For several reasons, it is highly likely that—as in most data breaches—incompetence and negligence by the defendant company, *i.e.*, Home Depot, caused the Breach.

### 1)  The Target Breach Should Have Put Home Depot On Notice

15.    <u>First</u>, the widely reported breaches of point-of-sale systems at, among others, Target, Neiman Marcus, Michaels Stores, P.F. Chang's, and Supervalu should have put Home Depot on notice to ensure that its own systems were not vulnerable to a similar attack.  The evidence suggests that the Home Depot Breach was committed by the same people who committed the Target breach and that they used the same or similar methods to attack Home Depot. According to a September 12, 2014 story in the Wall Street Journal: "The Target and Home Depot attacks … appear to have exploited a similar data vulnerability."

16.    The Target breach was first reported in December 2013.  The Target breach affected tens of millions of people, was the subject of a Congressional investigation, led to dozens of lawsuits and resulted in the resignations of Target's CEO and its Chief Information Officer.

17.    As noted above, the stolen Home Depot cards were advertised on the same underground website that sold many of the cards that were stolen in the Target breach. Moreover, it has been reported by SC Magazine that the Target breach was accomplished by installing malicious software ("malware") known as BlackPOS on Target's point-of-sale terminals. The Home Depot breach also targeted point-of-sale terminals.

18.     On September 8, 2014, the website Daily Tech published an extensive, in-depth examination of the "Appalling Negligence" that "Led to Home Depot Hack." The story referenced a November 2013 story by IT expert Harry Brelsford who had criticized Home Depot for continuing to use Windows XP, a thirteen-year-old operating system that is now more than three generations out of date. Mr. Brelsford's story posted this photo of Home Depot registers using the outdated operating system in November 2013:



19.     From the time it was first introduced, Windows XP has been notoriously vulnerable. As early as a December 10, 2003 story, *Geek* magazine wrote, with respect to a security breach of a bank using Windows XP on its ATM machines, "***you get what you deserve***. There is always a price attached to convenience … especially when it means moving from a very stable to a less stable

environment… It sounds like someone in their IT department didn't think this whole thing through."

20.     Target also used Windows XP. The operating system's vulnerability and connection to the Target breach was been well-known for months prior to the Breach. For example, on January 15, 2014, Consumer Affairs published a story with the headline "***Expiring Windows XP support may mean many more Target-sized data breaches***" and stating "the list of potential villains includes not just the hackers who broke into Target's system but also the millions of consumers, businesses and institutions that are still running Windows XP."

21.     On April 8, 2014, Microsoft officially ceased support for Windows XP, announcing that it would not be releasing any futher patches to protect machines operating Windows XP from cybersecurity attacks. Yet Home Depot did not upgrade its systems. In a September 3, 2014 post, Brelsford wrote "I told you so. … ***[T]his didn't have to happen***."

22.     In the words of *Daily Tech*, "if retailers truly cared about customers' security more than their bottom line, these hacks would never have happened in the first place.  Target and Home Depot rolled the dice … by clinging to legacy technology to pad their profits at the expense of consumers."

23.    A September 12, 2014 story in the Wall Street Journal details how slowly Home Depot moved in response to the Target breach. According to the Journal, "In the weeks after a massive data theft at Target Corp. became public in December, senior executives at Home Depot Inc. assembled a task force[.]" But "[i]t took a month for management and security staff to agree on a final list [of responses] that included buying expensive hacker-detection tools, upgrading the company's security operations center and purchasing intelligence feeds on hacker behavior." And "it wasn't until April—after months of testing—that Home Depot signed a more than $7 million contract with a data security provider to begin the work" of fully encrypting payment card data. By "early September, when the company says it became aware it was hacked, the encryption system had only been rolled out to a quarter of its stores."

24.    As Alan Paller, research director of the SANS Institute told the Journal, Home Depot's late start was inexcusable, given that similar breaches have been occurring since, at least, 2009: "***What's unreasonable is this was a 2014 decision***[.]"

2) "We Sell Hammers": Home Depot's Management Ignored Repeated Warnings From Their Employees

25.  Second, media reports indicate that Home Depot employees had repeatedly raised concerns about the Company's security systems, but were ignored by management. As the New York Times wrote on September 19, 2014:

> Interviews with former members of the company's cybersecurity team — who spoke on the condition they not be named, because they still work in the industry — suggest the company was slow to respond to early threats and only belatedly took action. In recent years, Home Depot relied on outdated software to protect its network and scanned systems that handled customer information irregularly, those people said. Some members of its security team left as managers dismissed their concerns. Others wondered how Home Depot met industry standards for protecting customer data. One went so far as to warn friends to use cash, rather than credit cards, at the company's stores.

26.  According to the Times story, "several former Home Depot employees said they were not surprised the company had been hacked. They said that over the years, when they sought new software and training, managers came back with the same response: '*We sell hammers.*'"

27.  The employees and former employees interviewed by the New York Times stated that "managers relied on outdated Symantec antivirus software from 2007 and did not continuously monitor the network for unusual behavior, such as a strange server talking to its checkout registers." Moreover, the Company "performed vulnerability scans irregularly on the dozen or so computer systems

inside its stores and often scanned only a small number of stores" even though the Payment Card Industry Data Security Standard ("PCI DSS") rules "require large retailers like Home Depot to conduct such scans at least once a quarter." While Home Depot data centers in Austin, Tex., and Atlanta were scanned, "more than a dozen systems handling customer information were not assessed and were off limits to much of the security staff."

28.    Avivah Litan, a cybersecurity analyst quoted by the Times, stated that "Scanning is the easiest part of compliance … There are a lot of services that do this. They hardly cost any money. And they can be run cheaply from the cloud."

29.    The New York Times story also noted that, in 2012, Home Depot hired a man named Ricky Joe Mitchell, who was quickly promoted to "a job in which he oversaw security systems at Home Depot's stores." Had Home Depot conducted proper diligence, however, it would have learned that, before joining Home Depot, Mitchell was "fired by EnerVest Operating, an oil and gas company, and, before he left, he disabled EnerVest's computers for a month. He was sentenced to four years in federal prison in April."

30.    Two recent stories in Bloomberg Businessweek echoed the concerns raised by the New York Times. On September 12, 2014, Businessweek published a story stating that "Home Depot's in-store payment system wasn't set up to encrypt

customers' credit- and debit-card data, a gap in its defenses that gave potential hackers a wider window to exploit, according to interviews with former members of the retailer's security team." According to that story, "five former staffers describe[d] a work environment in which employee turnover, outdated software, and a stated preference for 'C-level security' (as opposed to A-level or B-level) hampered the team's effectiveness. … Although the company this year purchased a tool that would encrypt customer-payment data at the cash register, two of the former managers say current Home Depot staffers have told them that the installation isn't complete." One manager told Businessweek that "[a] 'health check' on Home Depot's information systems, which was performed by Symantec employees two months ago, identified out-of-date malware-detection systems[.]"

31.    The list of problems was long:

> a. "The former managers say they were troubled by the lack of encryption for credit-card data at Home Depot stores. Data were sent from the stores to central servers in clear text, according to two of the former managers. This year, they say, Home Depot purchased a tool from Voltage Security to encrypt the card data, but the system hasn't yet been implemented."

b. "Three former information security managers also say that Home Depot was using out-of-date antivirus software for its point-of-sales systems. The program, Symantec's Endpoint Protection 11, was released in 2007. Symantec unveiled version 12 in 2011, saying in a news release that the 'threat landscape has changed significantly' and that the newer product would protect against the 'explosion in malware scope and complexity.'" Nonetheless, "Home Depot stayed with Endpoint Protection 11, despite staffers' pleas to executives, former managers say. Symantec this year began phasing out customer support for the older version. All such support will end on Jan. 5, 2015, according to a page on the software company's website, which bluntly states: 'This is the end of the product life cycle.'"

32.    When employees raised concerns about Home Depot's lackluster security, they were shot down:

> The former information security managers say that when they attempted to make improvements to Home Depot's security systems, they were at times turned down by its technology executives, including information security chief Jeff Mitchell. Two former managers, who left the company in 2011 and in 2012, said Mitchell told them to settle for 'C-level security' because ambitious upgrades

would be costly and might disrupt the operation of critical business systems. This management style frustrated a number of workers in Home Depot's information security department, leading to dozens of departures from a team of fewer than 50 over the past three years, according to the former managers.

33.    A follow-up story by Businessweek on September 18, 2014 revealed equally shocking lapses. According to that story, "In the year before cybercriminals penetrated payment systems of Home Depot stores in the U.S. and Canada, the retailer suffered at least two smaller hacks, according to internal company e-mails and reports." According to the report, "On July 25, 2013, a data-stealing virus at a Home Depot in Denton, Texas, spread to at least eight of the store's registers, according to an internal e-mail. In December, a store in Columbia, Md., was found to be infected with 'Infostealer,' malware known for lifting credit card data. It wasn't clear in either case whether customer cards were compromised."

34.    According to Businessweek, after these earlier breaches, "Home Depot security contractors urged the company to strengthen its cyberdefenses by activating a key, unused feature of its security software that the internal documents say would have added a layer of protection to the retail terminals where customers swipe their cards. ... Internal Home Depot documents show the Atlanta-based retailer had chosen to keep the extra security measure deactivated even though it

was designed specifically to spot the kind of malicious software that attacks systems' endpoints, like the registers that were hit at Target, Michaels (MIK), Neiman Marcus, and others."

35.    The Businessweek story stated further that Home Depot ignored clear written warnings from its consultants:

> Security consultants urged Home Depot several times from August 2013 to February 2014 to turn on an Endpoint Protection feature, the internal documents say. According to an Oct. 1, 2013, report prepared for Home Depot by consultant FishNet Security, the retailer left its computers vulnerable by switching off Symantec's Network Threat Protection (NTP) firewall in favor of one packaged with Windows. 'It is highly advised and recommended the NTP Firewall component be deployed and that Windows Firewall be discontinued,' the report states. For intrusion prevention to work properly, it says, NTP was needed on all Home Depot computers, including register payment terminals. Instead, the company kept the protection off its registers and continued to scan for suspicious activities at the network level, say the internal documents. FishNet declined to comment.

36.    Experts interviewed by Businessweek say these measures could have prevented the breach: "experts say it could have significantly raised chances of detecting the malware. 'Simple tactics go a long way, like keeping track that something new is running,' says Josh Grunzweig, a malware researcher at data analyst Nuix. 'I'd argue that would catch 95 percent of this stuff.'"

37. <u>Third,</u> the length of time that Home Depot's security was compromised strongly suggests that Home Depot was failing to comply with the Payment Card Industry Data Security Standard ("PCI DSS").

38. PCI DSS is an industry-standard information-security standard for organizations that handle cardholder information for the major debit, credit, prepaid, e-purse, ATM, and point-of-sale cards.

39. Among other policies and procedures, PCI DSS Requirement 10 requires organizations to "Regularly Monitor and Test Networks." This includes establishing audit logs that track access to all systems and conducting a regular review of those logs. Requirement 10.6 states that organizations must "Review logs and security events for all system components to identify anomalies or suspicious activities" and states that "Many breaches occur over days or months before being detected. Checking logs daily minimizes the amount of time and exposure of a potential breach."

40. PCI DSS Requirement 10.6.1 elaborates on the logs that should be reviewed daily: "All security events; Logs of all system components that store, process, or transmit [cardholder data] and/or [sensitive authentication data], or that could impact the security of [cardholder data] and/or [sensitive authentication data]; Logs of all critical system components; Logs of all servers and system

components that perform security functions (for example, firewalls, intrusion-detection systems/intrusion-prevention systems (IDS/IPS), authentication servers, e-commerce redirection servers, etc.)."

41.     Home Depot's failure to detect the Breach for almost six months suggests that it was failing to implement the daily log monitoring requirements of PCI DSS.  In a June 12, 2014 statement regarding an earlier data breach, John Harmon, the Principal Consultant of Sword & Shield Enterprise Security stated, that "Following the PCI DSS requirements, particularly the requirement for daily log monitoring will limit your breach to one or two days, not months." Here, of course, Home Depot's security was compromised for almost six months. This is powerful evidence that Home Depot was not complying with PCI DSS standards.

42.     Finally, Home Depot has experienced data breaches before—yet failed to address the problems with its security. In January 2011, Fox News reported that "[a]n IT analyst [had] uncovered the lingering remnants of a 2009 breach of security on [Home Depot's] website  … secret code hidden on the website that redirected the user's browser to a site that served up malware." Security expert Mike Menefee told Fox that Home Depot had been "pretty sloppy" in allowing this code to remain on its site.

### C. Plaintiff and the Class Have Been Harmed

43.    During the Relevant Period, Home Depot failed to disclose to the Class any of the security weaknesses described above.   Had Class members received full disclosure of the security risks to which Home Depot was exposing them, they would have paid less for the products that they purchased or not purchased them at all.

44.    Plaintiff and the Class have been further harmed because, as a result of the Breach, cyber-criminals now possess their personal financial information. While credit card companies offer protection against unauthorized charges, the process is long, costly, and frustrating.   Physical cards must be replaced, credit card information must be updated on all automatic payment accounts, and victims must add themselves to credit fraud watch lists, which substantially impairs victims' ability to obtain additional credit.   Information about Plaintiff and the other Class Members may also be used to harass or stalk them.

45.    According to a September 23, 2014 story in the Wall Street Journal, the "data breach at Home Depot Inc. has started to trigger fraudulent transactions that are rippling across financial institutions and, in some cases, draining cash from customer bank accounts, according to people familiar with the impact of the hacking attack. The fraudulent transactions are showing up across the U.S. as

criminals use stolen card information to buy prepaid cards, electronics and even groceries, these people said. In some cases, the fraudulent transactions have been tracked to batches of cardholder accounts that are tied to specific ZIP Codes, they said."

### D. Credit Monitoring Does Not Solve The Problem

46.     According to an email sent to customers on September 19, 2014, Home Depot is offering credit monitoring services to customers affected by the Breach. This does not make Plaintiff or Class members whole.

47.     An August 15, 2014 story in the Chicago Tribune discussed an offer of credit monitoring services, made by a company which had experienced a similar breach, and explained, "Payment card breaches have nothing to do with credit reports. It's like losing your keys in the street at night and searching for them under the lamppost a block away because the light is better there. Searching is easier but it won't help you solve the problem." The Tribune quoted John Ulzheimer, a credit expert with CreditSesame.com, who stated that an offer of credit monitoring is "a huge waste of time and can provide a false sense of security ... In fact, it's akin to the retailer telling their customers to bug off." Ulzheimer went on to say "Credit monitoring does nothing to identify or alert you when someone has compromised your existing payment information ... That type of

fraudulent activity does not show up on a credit report, so credit monitoring is woefully inadequate."

48.     The Tribune also quoted Paul Stephens, of the Privacy Rights Clearinghouse, who stated "[Credit monitoring] makes no sense at all ... I can't even envision a situation where credit monitoring would be helpful where it's strictly a breach of payment card information."  That's because "[f]raudulent use of a stolen card number won't show up on a credit report because they don't show individual charges.  And credit reports don't show debit card information at all."  Moreover, according to Stephens "a credit monitoring service is likely to hassle you after the free 12 months of service expire[.]"

## V.     CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action on behalf of himself and the following Class, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure:

> All persons in the United States who used a debit or credit card at a Home Depot self-checkout kiosk during the Relevant Period.

50.     The Class excludes the officers and directors, and current or former employees, as well as immediate family members thereof, of Home Depot and their parents, subsidiaries, and affiliates.

51.    Plaintiff reserves the right to amend the definition of this proposed Class, including by adding subclasses.

52.    The Class is so numerous that joinder of all members is impracticable. According to Home Depot's own estimates, information was stolen from approximately 56 million cards.

53.    There are questions of fact or law common to the Class. These questions include, but are not limited to:

   a. Whether Home Depot had a duty to disclose failures to comply with industry-standard cybersecurity practices;

   b. Whether Home Depot complied with industry-standard cybersecurity practices;

   c. Whether Home Depot concealed its noncompliance with industry-standard cybersecurity practices from its customers; and

   d. Whether Home Depot's failure to comply with industry-standard cybersecurity practices caused the Breach.

54.    Plaintiff's claims are typical of the Class and Plaintiff is not subject to any unique defenses.

55.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests do not conflict with the interests of the Class. Plaintiff has retained competent counsel experienced in class action litigation of this type. Plaintiff's counsel will fairly and adequately protect the interests of the Class.

56.   Certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members.

57.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Individual lawsuits are economically infeasible and procedurally impracticable.   "The more claimants there are, the more likely a class action is to yield substantial economies in litigation. … The realistic alternative to a class action is not [millions of] individual suits, but zero individual suits… [O]nly a lunatic or a fanatic sues for $30." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

58.   Plaintiff knows of no difficulty to be encountered in the management of this case that would preclude its maintenance as a class action.

## VI.   CLAIMS ALLEGED AND RELIEF SOUGHT

### COUNT 1
### Negligence

59.   Plaintiff and the Class incorporate by reference the foregoing allegations as though fully set forth herein.

60.   Home Depot owed a duty to Plaintiff and the Class to exercise reasonable care in safeguarding and protecting the personal and financial information in Home Depot's possession from being compromised, lost, stolen,

misused, and or/disclosed to unauthorized parties. This duty included, among other things, designing, maintaining, and testing Home Depot's security systems to ensure that Plaintiff and Class member's financial information was adequately secured and protected. Home Depot further had a duty to implement processes that would detect a security breach in a timely manner.

61. Home Depot breached this duty to exercise reasonable care in safeguarding and protecting Plaintiff and Class members' financial data by failing to adopt, implement, and maintain adequate security measures to safeguard data; failing to adequately monitor the security of point-of-sale systems; allowing unauthorized access to Plaintiff and Class members' data; and failing to recognize in a timely manner that security had been breached.

62. Home Depot's failures to comply with industry standards, such as PCI DSS, are evidence of its negligence in failing to exercise reasonable care in safeguarding and protecting the customer data in Defendants' possession.

63. But for Home Depot's wrongful and negligent breach of duties owed to Plaintiff and other Class members, their financial data would not have been compromised.

64. The injury and harm suffered by Plaintiff and Class members was the reasonably foreseeable result of Home Depot's failure to exercise reasonable care

in safeguarding and protecting the financial data collected from customers. Home Depot knew or should have known that the systems and technologies for processing and securing customers' data had security vulnerabilities.

## COUNT 2
### Strict Liability

65.     Plaintiff and the Class incorporate by reference the foregoing allegations as though fully set forth herein.

66.     Home Depot failed adequately to safeguard the private and confidential financial and personal information of its customers entrusted to it in the course of purchases made with debit cards and credit cards during the Relevant Period.

67.     Payment by debit or credit card increasingly is a necessity for consumers. Lack of such means of payment increasingly limits their purchase options and bargaining power. Retailers like Home Depot are eager to accept credit cards—and pay credit card companies handsomely for that privilege—because customers using credit cards spend more money than those paying with cash.

68.     Reliance on electronic means of payment and other recording of personal identity and financial data has left consumers increasingly susceptible to personal data and identity theft, the adverse consequences of which are also of increasing severity.

69.     Safeguarding private and confidential data of others in their possession is solely within the control of the recipients of that data, who are best able to distribute the cost of maintaining the security of that data and the consequences of the breach of such security.

70.     Plaintiff and Class members confided and entrusted their private and confidential financial and personal information to Home Depot solely for the purpose of effectuating payment for purchases made from Home Depot and with the expectation that Home Depot would strictly maintain the confidentiality of the information and safeguard it from theft or misuse.

71.     Plaintiff and Class members did not contribute in any way to the breach of Home Depot's information technology systems or the compromise or theft of their private and confidential financial and personal data.  Accordingly, Home Depot should be held strictly liable for the loss and damage suffered by Plaintiff and Class members resulting from Home Depot's failure to safeguard and maintain the confidentiality of their financial and personal data.

## COUNT 3
### Breach of Fiduciary Duty

72.     Plaintiff and the Class incorporate by reference the foregoing allegations as though fully set forth herein.

73.     Plaintiff and Class members entrusted private and confidential financial and personal information to Home Depot and placed trust and confidence in Home Depot in order to make payments.

74.     Home Depot had the benefit of a disparity of position and control and Plaintiff and Class members placed trust and confidence in Home Depot.

75.     Home Depot had a duty to maintain the confidentiality of the private and confidential financial and personal information, to safeguard and protect it from misuse by unauthorized persons.

76.     Home Depot breached this duty by failing to take necessary measures to maintain the confidentiality of Plaintiff's and Class members' private and confidential financial and personal information and to safeguard and protect it from misuse by unauthorized persons.

77.     The damages sustained by Plaintiff and Class members as described above were the direct and proximate result of Home Depot's breach of this fiduciary duty.

## COUNT 4
**Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, et seq.**

78.     Plaintiff and the Class incorporate by reference the foregoing allegations as though fully set forth herein.

79.    Plaintiff, the Class and Home Depot are "persons" within the meaning of O.C.G.A. § 10-1-392(a)(24).

80.    Plaintiff and the Class were injured by Home Depot's knowing and intentional use and employment of deceptive acts or practices in trade or commerce, including, among other things, uniformly failing to disclose its noncompliance with industry-standard cybersecurity practices.

81.    As a direct and proximate result of Home Depot's knowing and intentional deceptive acts and practices, Plaintiff and the Class overpaid for the goods and services that they purchased and have been damaged thereby.

## COUNT 5
### Breach Of Implied Contract

82.    Plaintiff and the Class incorporate by reference the foregoing allegations as though fully set forth herein.

83.    When they confided their private and confidential debit card and credit card information to Home Depot in order to make purchases at Home Depot stores, Plaintiff and the Class entered into implied contracts with Home Depot under which Home Depot agreed to safeguard and protect all such information.

84.    Plaintiff and the Class would not have entrusted their private and confidential financial and personal information to Home Depot in the absence of such an implied contract.

85.    Home Depot breached the implied contracts by failing to safeguard such information.

86.    The damages sustained by Plaintiff and the Class as described above were the direct and proximate result of Home Depot's breaches of these implied contracts.

## COUNT 6
### Negligent Misrepresentation

87.    Plaintiff and the Class incorporate by reference the foregoing allegations as though fully set forth herein.

88.    Home Depot had special knowledge of the methods and flaws in the methods by which it secured customer payments. Plaintiff and the Class did not have access to that information.  This information was material to Plaintiff's and the Class' decision to purchase products from Home Depot's stores.  Therefore, Home Depot had a duty to disclose flaws in its security methods.

89.    Home Depot did not disclose to Plaintiff or the Class that Home Depot did not abide by industry-standard cybersecurity practices—including by failing to conduct daily log monitoring—and had other deficiencies in its cybersecurity.

90.    Plaintiff and the Class justifiably relied on this omission, meaning that, under conditions of full disclosure, they would have paid less for the products

they purchased or would not have purchased those products from Home Depot, at all.

## COUNT 7
### Breach Of Implied Duty Of Good Faith And Fair Dealing

91.     Plaintiff and the Class incorporate by reference the foregoing allegations as though fully set forth herein.

92.     When they confided their private and confidential debit card and credit card information to Home Depot in order to make purchases at Home Depot stores, Plaintiff and the Class entered into contracts with Home Depot.

93.     These contracts implied a duty of good faith and fair dealing. Therefore, to the extent that Home Depot was given discretion in the manner in which it acted to safeguard Plaintiff and the Class's financial information, it was required to do so in good faith.

94.     Home Depot breached the implied duty of good faith and fair dealing by failing to safeguard Plaintiff and the Class's financial information.

95.     The damages sustained by Plaintiff and the Class as described above were the direct and proximate result of Home Depot's breaches of these duties.

## VII.    RELIEF REQUESTED

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment in his favor as follows:

A. Certify this matter as a class action, appoint Plaintiff's attorneys as class counsel, and issue notice to the Class;

B. Enter judgment in favor of Plaintiff and the Class against Defendant;

C. Award to Plaintiff and Class members actual, statutory, and punitive damages;

D. Award appropriate pre- and post-judgment interest;

E. Grant an award of reasonable attorney's fees and other litigation costs reasonably incurred, including expert witness fees; and

F. Award any and all other relief to which Plaintiff and the Class may be entitled.

## VIII.    JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

### <u>CERTIFICATION OF FONT AND POINT SELECTIONS</u>

The undersigned attorney certifies that this pleading is prepared in 14 point, Times New Roman font, pursuant to Local Rule 5.1C.

Dated:  October 10, 2014

Respectfully submitted,

Stephen J. Anderson
Georgia Bar No. 018325

ANDERSON DAILEY LLP
2002 Summit Boulevard, Suite 1250
Atlanta, Georgia 30319
(404) 442-1800 (telephone)
(404) 442-1820 (facsimile)
anderson@andersondailey.com


Jeffrey C. Block
Whitney E. Street
Joel A. Fleming

BLOCK & LEVITON LLP
155 Federal Street, Suite 400
Boston, Massachusetts  02110
(617) 398-5600 (telephone)
(617) 507-6020 (facsimile)
Jeff@blockesq.com
Whitney@blockesq.com
Joel@blockesq.com

*Counsel for Plaintiff*